IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL L. BEATTIE,                    No. C 11-1187 CW (PR)

      Plaintiff,                    ORDER GRANTING DEFENDANTS'
                                       MOTIONS FOR SUMMARY JUDGMENT;
  v.                                   DENYING PLAINTIFF'S CROSS-
                                       MOTION FOR SUMMARY JUDGMENT;
SUE RISENHOOVER, et al.,              DENYING AS MOOT PLAINTIFF'S
                                       REQUEST FOR COURT DOCUMENTS
      Defendants.
                                       (Docket nos. 16, 19, 23)
_____/

INTRODUCTION

Plaintiff, a state prisoner currently incarcerated at R.J. Donovan State Prison in San Diego, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his serious medical needs by medical practitioners at Pelican Bay State Prison (PBSP).

Defendants Dr. Nancy Adam, Family Nurse Practitioner (FNP) Sue Risenhoover and Chief Medical Officer Dr. Michael Sayre, who are represented by the law firm of Andrada & Associates, have filed a motion for summary judgment, as has Defendant Dr. Martinelli, who is represented by the law firm of Janssen Malloy, LLP.  Plaintiff has filed a joint opposition to both motions and a cross-motion for summary judgment.  Defendants have replied to Plaintiff's opposition and Dr. Martinelli has opposed Plaintiff's motion for summary judgment.

For the reasons discussed below, the Court GRANTS Defendants' motions for summary judgment and DENIES Plaintiff's motion for summary judgment.

BACKGROUND

The following facts are taken from the parties' verified pleadings and declarations. They are undisputed unless otherwise noted.

Plaintiff suffers from ulcerative colitis, an inflammatory bowel disease that causes inflammation and sores in the large intestine. Ulcerative colitis also may be called colitis or proctitis. Decl. Michael Sayre Supp. Summ. J. (Sayre Decl.) ¶ 3. The events at issue occurred when Plaintiff was housed in the Transitional Housing Unit (THU) at PBSP in 2009 and 2010. At that time, Dr. Sayre was the Chief Medical Officer at PBSP, FNP Risenhoover was Plaintiff's primary care provider (PCP) at PBSP, Dr. Adam was a physician and surgeon at PBSP, and Dr. Martinelli was a contracting physician providing primary and specialty colonoscopy care and treatment to inmates at PBSP.

Plaintiff's medical records reflect that in October 1998, while he was incarcerated at PBSP, a rectal biopsy showed he was suffering from moderate chronic proctitis with a possibility of chronic inflammatory bowel disease. In June 2003, he underwent a five-year checkup; colon biopsies showed a benign colon mucosa and a benign lymphoid polyp. Compl. ¶ 5; Sayre Decl. ¶ 5 & Ex. A.

Plaintiff remained symptom-free until early May 2009, when he began experiencing painful cramping, mucus discharge and blood in his stool, and more frequent bowel movements. Compl. ¶ 5. On May 3, he submitted a medical health care request to see a doctor;[1] on

---

[1] All events described hereinafter occurred in 2009, unless otherwise noted.

United States District Court
For the Northern District of California

May 4, he was seen by a nurse who scheduled him for an evaluation with his PCP.  Sayre Decl. ¶ 6.  On May 7, Plaintiff submitted another medical request form stating his symptoms were worsening. Compl. ¶ 7 & Ex. A-2.[2]  On May 11, he was seen by a nurse who prescribed a Colocort enema[3] for two days and advised Plaintiff to stop eating dairy products.  Sayre Decl. ¶ 7 & Ex. C.

Between May 19 and 21, Plaintiff submitted three medical requests to see a doctor due to severe abdominal cramps and bloody stools.  Compl. & Ex. B.  On May 21, Dr. Adam spoke with one of the nurses who had seen Plaintiff about his condition.  Dr. Adam noted a "flare of colitis" in the chart.  She prescribed Asacol, Prednisone and Colocort.[4]  She also ordered lab tests.  Sayre Decl. ¶ 8 & Ex.

On May 25, Plaintiff filed an administrative appeal complaining he was not being provided with adequate care for his symptoms.  He requested that he be provided a colonoscopy, a protein supplement, and medication that he had been prescribed in the past for his colitis.  He was interviewed by a nurse on May 29; she granted his request to be referred for a colonoscopy,

_____

[2] The exhibits to which Plaintiff refers in his complaint are submitted in support of his opposition to Defendants' motions for summary judgment.

[3] A Colocort enema is used together with other medications to treat ulcerative colitis, proctitis, and other inflammatory conditions of the lower intestines and rectal area.

[4] Asacol is an anti-inflammatory medication used to treat ulcerative colitis.  Prednisone is a corticosteroid that is used as an immune system suppressant in the treatment of ulcerative colitis.

United States District Court
For the Northern District of California

denied his request for a protein supplement because it was not medically indicated, informed him that his current medication (Asacol) was the same as what he had requested, and noted that his lab results were normal. Sayre Decl. ¶ 9 & Ex. E.

On June 7, Plaintiff submitted another medical request complaining that the treatment he was receiving was not adequate because he continued to suffer from abdominal cramps and frequent bloody stools. On June 10, he was seen by a nurse who scheduled him to see Dr. Martinelli at the specialty clinic "next Wednesday," and noted that he had a pending follow-up appointment with his PCP. Sayre Decl. ¶ 10 & Ex. F.

On June 17, Plaintiff saw Dr. Martinelli for the first time, for a colonoscopy consultation; Dr. Martinelli took Plaintiff's history, performed a physical examination, and recommended that he be scheduled for a colonoscopy. Decl. Thomas Martinelli Supp. Mot. Summ. J. (Martinelli Decl.) ¶ 8. On June 24, Dr. Sayre approved Plaintiff's request for a colonoscopy. Sayre Decl. ¶ 11 & Ex. E.

On June 29, Dr. Martinelli performed the colonoscopy at Sutter Coast Hospital. He took three separate biopsies and diagnosed Plaintiff's condition as: "Rectal proctitis, most likely due to ulcerative colitis, isolated at this time." Martinelli Decl. ¶ 8 & Ex. B. He recommended that Plaintiff receive Azulfadine 500 mg tablets twice a day for ninety days in addition to hydrocortisone enemas for two weeks,[5] that he follow up with

---

[5] Azulfadine is a drug used to treat bowel inflammation, stool frequency, rectal bleeding, and abdominal pain in patients with ulcerative colitis.

United States District Court
For the Northern District of California

4

his PCP as usually scheduled, and that he be seen again by Dr. Martinelli at the next colonoscopy clinic.  Id.

On July 13, Plaintiff submitted an administrative appeal complaining that the treatment he was receiving was not working and that his symptoms were getting worse.  He asked to be seen by the doctor for additional treatment, and to be put on a chronic care schedule to be seen every thirty days until his symptoms subside or go into remission.  Sayre Decl. ¶ 13 & Ex. F.

On July 31, Plaintiff was examined by Dr. Martinelli at the colonoscopy clinic.  He complained of blood and mucus in his stools and abdominal pain.  Dr. Martinelli noted that the pathology samples from Plaintiff's biopsies showed rectal colitis consistent with ulcerative colitis.  Further, Plaintiff had had two weeks of hydrocortisone enemas and was on Asacol 800 mg, but his symptoms persisted.  Dr. Martinelli's plan at that point was to consider the next level of medication, Cyclophosphamide at 50 mg for one month, and if that did not succeed to recommend intravenous Remicade.[6]  Martinelli Decl. ¶ 9.  Pursuant to prison health system parameters, Dr. Martinelli had authority to recommend drug treatment but did not have the final authority to order it.  Decl. Thomas J. Rydz, M.D., Supp. Martinelli Mot. Summ. J. (Rydz Decl.) ¶ 9.

On August 5, Plaintiff saw FNP Risenhoover and complained of painful side effects from the Cyclophosphamide and that the

_____

[6] Cyclophosphamide is a chemotherapy agent that is an immunosuppressant; Remicade is a "top of the line" medicine and a more aggressive chemotherapeutic immunosuppressant agent that is infused intravenously.  Decl. Thomas J. Rydz, M.D., Supp. Martinelli Mot. Summ. J. (Rydz Decl.) ¶ 10.

United States District Court
For the Northern District of California

medication was not working.  The record shows, however, that it was at this visit that FNP Risenhoover first informed Plaintiff that Dr. Sayre had agreed to order the Cyclophosphamide and that his treatment would start after his upcoming dental checkup. Sayre Decl. ¶ 15 & Ex. J.

On August 17, Plaintiff started treatment with Cyclophosphamide.  Sayre Decl. ¶ 17 & Ex. K.  On August 24, he submitted a medical request complaining that the drug wasn't working.  Compl. ¶ 23.  On August 26, he was seen by FNP Risenhoover, who renewed his prescription for Asacol.  Sayre Decl. Ex. K.

On August 31, Plaintiff was seen by Dr. Martinelli.  After examining Plaintiff, Dr. Martinelli discussed his care with FNP Risenhoover, and recommended to her that his Cyclophosphamide dosage be increased from 50 to 100 mg a day and that a request be placed with the Utilization Review Committee to allow him to receive Remicade treatments.  Martinelli Decl. ¶ 10; Sayre Decl. ¶ 17 & Ex. K.

On September 4 and 10, Plaintiff sent letters to Dr. Sayre complaining of the lack of effective treatment and pain medication.  On September 10 and 18, he submitted medical requests complaining that the Cyclophosphamide wasn't working and that he was suffering side effects.  On September 21, he submitted a medical request complaining that the pain was becoming so bad that he couldn't sleep and was becoming depressed.  Compl. ¶¶ 25-28.

On September 21, Plaintiff was seen by FNP Risenhoover, to whom he complained of cramping, bloody stools and diarrhea. Risenhoover prescribed Tylenol as needed for pain for thirty days,

United States District Court
For the Northern District of California

Simethicone three times a day for fourteen days for symptoms of gas such as uncomfortable or painful pressure, fullness, and bloating, and increased Plaintiff's Cyclophosphamide dosage another 50 mg, to 150 mg per day for two weeks.  Sayre Decl. ¶ 18 & Ex. L.

On September 24, Plaintiff submitted another medical request complaining of pain and side effects from the Cyclophosphamide. Compl. ¶ 30.

On October 6, Plaintiff was seen by Dr. Martinelli who, after hearing of Plaintiff's continued complaints, suggested that he receive treatment with Remicade and signed a recommendation providing for such treatments at Sutter Coast Hospital. Martinelli Decl. ¶¶ 12-13.  On October 14, FNP Risenhoover reviewed the chart and Dr. Martinelli's recommendations; she informed Plaintiff that he had been approved for Remicade treatments and scheduled a follow-up appointment with him in thirty days.  Sayre Decl. ¶ 19 & Ex. M.

On October 26, Plaintiff received his first Remicade infusion at Sutter Coast Hospital.  Sayre Decl. ¶ 20 & Ex. N.

On November 6, Plaintiff received his second Remicade infusion.  That same date, he submitted a medical request complaining of a burning sensation when urinating.  Dr. Adam ordered a urine sample that was sent to the lab the same day, and instructed Plaintiff to notify a nurse if there were any changes in his condition.  Sayre Decl. ¶ 20 & Ex. N; Compl. ¶ 32.

On November 8 and 11, Plaintiff submitted additional medical requests complaining of continued burning sensation and distress. On November 11, he was told that antibiotics had been ordered to

United States District Court
For the Northern District of California

treat what had been diagnosed as a urinary tract infection; he started taking the antibiotics on November 12.  On November 25, he was seen for a follow-up medical appointment, at which time it was noted that the infection had resolved.  Sayre Decl. ¶ 20 & Ex. N; Compl. ¶¶ 35-38.

On December 7, Plaintiff received his third Remicade infusion.  He was examined that same day by Dr. Martinelli, who but still had some blood and mucus, as Plaintiff continued to experience moderate gas and cramping.  Dr. Martinelli recommended that Plaintiff continue treatment with Asacol and Remicade, and return in two months for a follow-up examination.  Martinelli Decl. ¶ 13; Sayre Decl. ¶ 21 & Ex. O.

FNP Risenhoover examined Plaintiff on December 30.  Plaintiff reported thirty percent improvement in his symptoms after his last Remicade treatment.  Risenhoover consulted with Dr. Sayre, and they agreed to continue Plaintiff's treatment with Cyclophosphamide at 50 mg per day.  Plaintiff's prescription for Asacol also was renewed.  Sayre Decl. ¶ 22 & Ex. P.

Dr. Martinelli saw Plaintiff on January 8, 2010.[7]  Plaintiff reported that he had less blood and mucus in his bowel movements, but he still was having many per day with some cramping.  Dr. Martinelli recommended continued Remicade treatments, noting the possibility of increasing the dose if the symptoms continued, and scheduled Plaintiff to return in three months.  Additionally, after learning that Plaintiff was being considered for transfer to

---

[7] All events described hereinafter occurred in 2010, unless otherwise noted.

United States District Court
For the Northern District of California

another facility and feeling that his treatment for ulcerative colitis would be served best if he were to remain at PBSP, Dr. Martinelli noted in Plaintiff's chart that he "would not recommend transfer for further treatment." Martinelli Decl. ¶ 14; Sayre Decl. ¶ 23 & Ex. Q.

Plaintiff received his fourth Remicade infusion on February 1. Sayre Decl. ¶ 24 & Ex. R. He was seen on February 9 by Dr. Martinelli, who noted significant improvement in his symptoms and requested that the Remicade infusions continue for a total of eight weeks. Dr. Martinelli felt that Plaintiff's condition was such that he did not need a follow-up appointment at the colon clinic unless requested by his PCP. Additionally, because the matter of his transfer had not yet been resolved, Dr. Martinelli noted in Plaintiff's chart: "It is imperative that Mr. Beattie not miss his treatments, even upon transfer to another facility." Martinelli Decl. ¶ 15; Sayre Decl. ¶ 24 & Ex. R.

On March 12, Plaintiff reported at a chronic care appointment that his condition had improved by approximately seventy-five percent and the "violent pain is gone." Sayre Decl. ¶ 25 & Ex. S.

On March 29, Plaintiff received his fifth Remicade infusion. Sayre Decl. ¶ 25 & Ex. S. On April 12, he was seen for a follow-up appointment; he reported that he was feeling "[d]ecent" since the last Remicade treatment. Sayre Decl. Ex. S.

As a result of the Remicade treatments, Plaintiff's symptoms improved from December 2009 through April 2010. In May 2010, however, they returned. On May 9, Plaintiff submitted a medical request. Compl. ¶¶ 39-41. On May 11, he was seen by a nurse who advised him to continue taking his medications, and reminded him

United States District Court
For the Northern District of California

of his upcoming Remicade treatment in the last week of May.  He submitted another medical request on May 16; on May 18, he was seen by another nurse, who examined him, advised him to continue taking his medications, reminded him of his upcoming Remicade treatment, and told him to advise medical staff if his symptoms persisted or worsened.  Sayre Decl. ¶ 26 & Ex. T.

In mid- to late May, Plaintiff wrote a letter to Dr. Sayre, describing his medical condition and expressing concern that he was not getting a response from medical staff.  He also submitted another medical request, asking to see the doctor.  Compl. ¶¶ 43-44.  Dr. Sayre responded to Plaintiff's letter, acknowledging the seriousness of his disease and symptoms and explaining the progress of his treatment.  Pl.'s Opp'n Ex. N-3.

Also around that time, Plaintiff sent a letter to Dr. Martinelli's home address, describing his medical condition and asking Dr. Martinelli to intervene in his care.  Because Plaintiff's action was a violation of prison regulations, Dr. Martinelli was required to notify prison officials.  Nevertheless, Dr. Martinelli also contacted Plaintiff's PCP, FNP Risenhoover, informed her of the letter, and advised her that if Plaintiff was failing on his current treatment, he should be referred to a gastroenterologist.  Martinelli Decl. ¶ 16 & Ex. "Physician's Progress Notes" dated June 4, 2010.

On June 16, Dr. Sayre, after seeing Plaintiff for a chronic care appointment, wrote in his notes that Plaintiff was failing medical treatment for his ulcerative colitis and likely would need surgery.  Dr. Sayre noted that, even though Plaintiff had a pending transfer, he would schedule a local consultation for him

United States District Court
For the Northern District of California

because, "We should not wait and do nothing for a year with this level of symptoms and disease progression."  Dr. Sayre Decl. ¶ 27 & Ex. U.

On July 1, Dr. Martinelli was asked to provide voice orders for a colonoscopy pre-procedure preparation for Plaintiff; he also recommended that the Prednisone Plaintiff was receiving be continued until he was seen by his PCP.  Martinelli Decl. ¶¶ 16-17.

Plaintiff received his eighth Remicade infusion on September 13.  Sayre Decl. ¶ 28 & Ex. V.

Dr. Martinelli saw Plaintiff a final time on September 17, and scheduled him for a colonoscopy.  On September 20, Dr. Martinelli gave the pre-operative orders for the procedure; on September 23, Plaintiff refused to undergo the pre-operative preparations.  Martinelli Decl. ¶ 18.

In November 2010, Plaintiff was transferred to RJ Donovan Correctional Facility in San Diego County, where he currently is incarcerated.

A colonoscopy was performed on February 25, 2011, at "The Center for Endoscopy" in Oceanside, California.  The report of that procedure concluded that Plaintiff "appears to be in endoscopic remission."  Sayre Decl. ¶ 29 & Ex. W.

DISCUSSION

I.   Legal Standard

Summary judgment is only proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are

11

those that may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson, 477 U.S. at 248 (holding fact to be material if it might affect outcome of suit under governing law).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec.
Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may consider only admissible evidence in
ruling on a motion for summary judgment.  See Fed. R. Civ. P.
56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002).
A verified complaint may be used as an opposing affidavit under
Rule 56, as long as it is based on personal knowledge and sets
forth specific facts admissible in evidence.  See Schroeder v.
McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995); see also
Keenan v. Hall, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), amended,
135 F.3d 1318 (9th Cir. 1998) (treating allegations in prisoner's
verified amended complaint as opposing affidavit); Johnson v.
Meltzer, 134 F.3d 1393, 1400 (9th Cir. 1998) (treating allegations
in verified motion as opposing affidavit).

II.   Analysis

Plaintiff claims Defendants acted with deliberate
indifference to his serious medical needs by failing to provide
him with timely and adequate treatment for his ulcerative colitis
and the pain resulting therefrom, and for side effects from the
medications he was prescribed to treat his condition, including a
urinary tract infection.

Deliberate indifference to serious medical needs violates the
Eighth Amendment's proscription against cruel and unusual
punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976);
McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled
on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133,
1136 (9th Cir. 1997) (en banc).  A determination of "deliberate
indifference" involves an examination of two elements: the

seriousness of the prisoner's medical need, and the nature of the defendant's response to that need.  See id., 974 F.2d at 1059.

A.   Serious Medical Need

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Id.  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment.  Id. at 1059-60.

Defendants do not dispute that Plaintiff suffers from a serious medical need.  Based on the evidence detailed above, the Court finds Plaintiff has shown that he has a serious medical need.

B.   Deliberate Indifference

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  Id.

Deliberate indifference may be shown when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which they provide medical care. See McGuckin, 974 F.2d at 1062.  But neither a difference of

opinion between a prisoner-patient and prison medical authorities regarding treatment nor a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is sufficient to establish deliberate indifference.  See Toguchi v. Chung, 391 F.3d 1051, 1059-60 (9th Cir. 2004); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  The reliance by prison officials upon a second medical opinion which a reasonable person would likely determine to be inferior to one from a more qualified medical authority, however, may amount to an Eighth Amendment violation.  See Hamilton v. Endell, 981 F.2d 1062, 1066-67 (9th Cir. 1992).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. Toguchi, 391 F.3d at 1058.

      1.   Dr. Adam, FNP Risenhoover and Dr. Sayre

Defendants Dr. Adam, FNP Risenhoover and Dr. Sayre argue that Plaintiff's evidence does not raise a genuine issue for trial concerning whether they acted with deliberate indifference to his serious medical needs.  In support of their motion for summary judgment, Defendants have provided the declaration of Dr. Sayre and supporting documents from Plaintiff's medical records.

According to the evidence provided by the parties, the first documentation of Plaintiff's ulcerative colitis after he was incarcerated is from a diagnostic procedure in 1998, and he remained symptom-free until May 2009.  Thereafter, he was treated

by Defendants for his ulcerative colitis from May 2009 through early July 2010.

Although Plaintiff does not dispute that he received some amount of treatment from Defendants, he maintains that they acted with deliberate indifference by failing to halt ineffective medications, try new medications and treat his pain.  The Court finds, however, that Plaintiff's evidence does not raise a genuine issue of material fact.

As noted, it is undisputed that ulcerative colitis is a serious and painful disease.  Moreover, it also is undisputed that there is no one method of treatment for the disease and its painful symptoms.  In his declaration, Dr. Sayre states the following regarding the proper treatment for ulcerative colitis:

> Treatment for ulcerative colitis depends on the seriousness of the disease.  Most people are treated with medication. In severe cases, a patient may need surgery to remove the diseased colon.  Surgery is the only cure for ulcerative colitis.  Each person may experience ulcerative colitis differently, so treatment is adjusted for each individual.  Some people have remissions, periods when the symptoms go away, that last for months or even years.  However, most patients' symptoms eventually return.  This changing pattern of the disease means one cannot always tell when a treatment has helped.

Sayre Decl. ¶ 4.

Plaintiff has not presented medical evidence that calls into question the reasonableness of Dr. Sayre's medical opinion in this regard.  Further, the evidence shows that the severity of Plaintiff's disease required Defendants to adjust his treatment plan continuously.  This was explained thoroughly in a letter Dr. Sayre wrote to Plaintiff on May 18, 2010, in response to a letter

from Plaintiff complaining about his ongoing symptoms and pain.
Dr. Sayre acknowledged the severity of Plaintiff's disease and
symptoms, explained why certain treatment methods had been chosen
and why they are not always successful, and described what had
been done to help alleviate his pain:

> I agree that you have the very serious medical
> condition of Ulcerative Colitis. As in you[r] case, it
> is typically a progressive disease that eventually
> involves destruction of the entire colon.  At that
> point, the only option is complete removal of the colon
> with permanent diversion to a plastic pouch on the
> abdominal wall.  Naturally, delaying this outcome as
> long as possible is preferred.  The medical treatment of
> this disease typically only delays this outcome.  Each
> successive treatment plan only works for a limited time
> and then is never effective again.  We attempt to use
> each treatment option as long as there is any benefit.
> We strive to delay going to each subsequent step as
> there are finite steps available.  While it may appear
> we have been reluctant and slow to progress to each
> subsequent step in your treatment, there is little to be
> gained and a lot to be lost by speeding the process.
>
> I am sorry to hear that Remica[de] is failing. That
> it is failing is not surprising.  For those cases that
> do not stop, all medical treatments eventually fails
> [sic].  It is a very dangerous drug and can only be
> given at the prescribed timing and amounts.  Obviously,
> such a dangerous drug is only given at the very end of
> the medical treatment of Ulcerative Colitis.
>
> As to the contentions in your letter, let me make
> some points.  There is no available change in the
> Remica[de] dosing.  We should use it as long as there is
> any benefit.  More or different chronic care visits and
> consultations will not change the short term effort to
> milk the last benefit from the Remica[de].  You are
> receiving two other medications to help with comfort and
> reductions in symptoms.  You are encouraged to submit
> sick call slips (7362) for any problems or unexpected
> changes in condition.  I note that you have not
> submitted any 7362's concerning colitis since 12/6/09.
> It is unfortunate that you write long letters when a
> simple 7362 is much more effective.

Pl.'s Opp'n Ex. N-3.

17

1    Plaintiff has not presented medical evidence that supports

2  his claim that Defendants mismanaged the treatment for his

3  ulcerative colitis, the pain caused by the disease and the side

4  effects caused by the treatments he received.  Rather, the

5  evidence shows that, over a fourteen-month period, Defendants

6  provided him with numerous medications that are used to treat the

7  underlying disease of ulcerative colitis and its painful symptoms

8  (Asacol, Colocort, Prednisone, Cyclophosphamide and Remicade), and

9  with other medications that are not used to treat the disease

10  itself but are designed to decrease the pain caused by symptoms

11  such as gas, cramping, bloating and rectal discomfort (Azulfidine,

12  Simethicone, Tylenol and enemas).  Additionally, when Defendants

13  recognized that the Remicade treatments no longer were effective

14  and all other treatments had failed, Plaintiff was prescribed oral

15  morphine for his pain.

16    While it is undisputed that some of the medical treatments

17  Plaintiff received were more successful than others in treating

18  the disease and providing pain relief, the evidence shows that

19  Defendants took reasonable steps to treat him and abate any

20  painful symptoms or treatment side effects by monitoring his

21  medical condition continuously, addressing his complaints in a

22  timely manner, providing him with ongoing treatment that was

23  adjusted as necessary, and following the recommendations of Dr.

24  Martinelli, the specialist to whom Plaintiff had been referred.

25    Based on this record, the Court finds that Plaintiff has not

26  raised a genuine issue for trial with respect to whether

27  Defendants acted with deliberate indifference to his serious

28  medical needs.  Accordingly, summary judgment is GRANTED in favor

of Defendants Dr. Adam, FNP Risenhoover and Dr. Sayre.

        2.   Dr. Martinelli

     Plaintiff claims that Dr. Martinelli acted with deliberate indifference to his serious medical needs by 1) continuing and/or increasing the dosage of medications that ultimately proved ineffective in treating his ulcerative colitis; 2) ignoring the pain he was suffering from his ulcerative colitis; and 3) ignoring the painful side effects he was suffering from treatments with chemotherapy drugs.

     As discussed above, deliberate indifference is not established simply by a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment.  See Franklin, 662 F.2d at 1344.  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health.  Toguchi, 391 F.3d at 1058.

     Having reviewed the parties' evidence, the Court finds that Plaintiff has not created a genuine issue for trial with respect to whether Dr. Martinelli acted with deliberate indifference to his serious medical needs.

     In support of his motion for summary judgment, Dr. Martinelli has provided his declaration and attached medical records reflecting the care and treatment he provided to Plaintiff during the relevant time period.  Additionally, he has provided the declaration of Thomas J. Rydz, M.D., a physician board-certified in general surgery, whose practice includes endoscopic examination

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and procedures, including colonoscopy.  Relying on the medical records provided by Dr. Martinelli, Dr. Rydz opines that the care and treatment Plaintiff received from Dr. Martinelli was within the medical standard of care for any patient receiving treatment for ulcerative colitis, whether incarcerated or not.  Rydz Decl. ¶¶ 18-20.

Specifically, the evidence shows that Dr. Martinelli took appropriate histories and physicals, prescribed indicated medications, treated Plaintiff in a timely fashion, and attempted to treat the condition in the most reasonably conservative manner, becoming more aggressive as needed.  Rydz Decl. ¶¶ 8-10, 15-20.

Additionally, the evidence shows that Dr. Martinelli took reasonable steps to alleviate the pain Plaintiff was suffering from his ulcerative colitis and drug treatments.  Notably, the evidence is undisputed that Dr. Martinelli did not have the authority to prescribe medication for PBSP inmates; rather, he only could recommend to prison medical personnel that certain medications or treatments be prescribed.  The evidence shows that Dr. Martinelli acted within the standard of care by recommending medications to treat the inflammation in Plaintiff's colon and small intestine, which can cause cramping and pain, and that treating Plaintiff with Cyclophosphamide, in the doses and for the reasons prescribed by Dr. Martinelli, is within the standard of care of a physician treating ulcerative colitis.  Rydz Decl. ¶¶ 7, 9-15, 18.

Although Plaintiff complains that Dr. Martinelli's treatment was inadequate, he has not provided medical opinions that call into question or contradict Dr. Martinelli's evidence that his

United States District Court
For the Northern District of California

1  treatment choices were medically acceptable under the

2  circumstances.

3      Accordingly, the Court finds Plaintiff has failed to raise a

4  genuine issue for trial as to whether Dr. Martinelli acted with

5  deliberate indifference to his serious medical needs, and summary

6  judgment is GRANTED in favor of Dr. Martinelli.

7      C.   Qualified Immunity

8      All Defendants argue that they are entitled to qualified

9  immunity.

10     The defense of qualified immunity protects "government

11 officials . . . from liability for civil damages insofar as their

12 conduct does not violate clearly established statutory or

13 constitutional rights of which a reasonable person would have

14 known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The

15 threshold question in qualified immunity analysis is: "Taken in

16 the light most favorable to the party asserting the injury, do the

17 facts alleged show the officer's conduct violated a constitutional

18 right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  The relevant,

19 dispositive inquiry in determining whether a right is clearly

20 established is whether it would be clear to a reasonable defendant

21 that his conduct was unlawful in the situation he confronted.  Id.

22 at 202.

23     On the facts presented herein, viewed in the light most

24 favorable to Plaintiff, Defendants prevail as a matter of law on

25 their qualified immunity defense because the record establishes no

26 constitutional violation.  Even if a constitutional violation did

27 occur, however, Defendants reasonably could have believed their

28 conduct was lawful.  Specifically, it would not have been clear to

Defendants that they failed to take reasonable steps to abate a
substantial risk of harm to Plaintiff by providing him with the
above-described care and treatment for his ulcerative colitis
symptoms and the symptoms he experienced as a side effect of such
care and treatment.

Accordingly, Defendants are entitled to qualified immunity,
and their motions for summary judgment are GRANTED for this reason
as well.

D.   Plaintiff's Cross-Motion for Summary Judgment

On the first page of what is captioned as "Plaintiff's Motion
in Opposition of Defendants' Motion for Summary Judgment,"
Plaintiff states that he "now files his Opposition to
[Defendants'] S.J. Motions and files a Cross-Motion for Summary
Judgment."  Opp'n at 1.  The entirety of the document, however, is
dedicated to opposing Defendants' summary judgment motions; no
separate cross-motion for summary judgment was filed with the
Court.  In an abundance of caution, the Court will construe
Plaintiff's arguments in opposition to Defendants' summary
judgment motions also as a cross-motion for summary judgment.

When the parties file cross-motions for summary judgment, the
district court must consider all of the evidence submitted in
support of both motions to evaluate whether a genuine issue of
material fact exists precluding summary judgment for either party.
The Fair Housing Council of Riverside County, Inc. v. Riverside
Two, 249 F.3d 1132, 1135 (9th Cir. 2001).

Based on the record in this matter, and for the reasons
discussed above, the Court concludes that Plaintiff has not
presented evidence, much less established, that Defendants acted

United States District Court
For the Northern District of California

with deliberate indifference to his serious medical needs.  No undisputed facts exist which entitle Plaintiff to judgment as a matter of law.  Accordingly, Plaintiff's motion for summary judgment is DENIED.

CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.   Summary judgment is GRANTED in favor of all Defendants. Docket nos. 19 & 23.

2.   Plaintiff's cross-motion for summary judgment is DENIED.

3.   Plaintiff's request for copies of court documents is DENIED as moot.  Docket no. 16.

This Order terminates Docket nos. 16, 19 and 23.

The Clerk of the Court shall enter judgment in favor of Defendants and close the file.  All parties shall bear their own costs.

IT IS SO ORDERED.


Dated:  9/27/2012

CLAUDIA WILKEN
United States District Judge